**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCAP-10-0000157
04-MAY-2012
08:48 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

DEPARTMENT OF ENVIRONMENTAL SERVICES,
CITY AND COUNTY OF HONOLULU,
Petitioner/Appellant-Appellant,

vs.

LAND USE COMMISSION, STATE OF HAWAI'I; COLLEEN HANABUSA;
MAILE SHIMABUKURO; and KO OLINA COMMUNITY ASSOCIATION,
Respondents/Appellees-Appellees.

NO. SCAP-10-0000157

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 09-1-2719-11))

MAY 4, 2012

RECKTENWALD, C.J., NAKAYAMA, ACOBA, DUFFY, AND MCKENNA, JJ.

OPINION OF THE COURT BY DUFFY, J.

Petitioner-Appellant Department of Environmental

Services, City and County of Honolulu ("DES" or "City"), appeals

from the October 19, 2010 final judgment of the Circuit Court of

the First Circuit[1] (circuit court) in support of its September 21, 2010 order, which affirmed Respondent-Appellee Land Use Commission's ("LUC") October 22, 2009 "Order Adopting the City and County of Honolulu Planning Commission's Findings of Fact, Conclusions of Law and Decision and Order With Modifications" (LUC Order). We accepted DES' appeal on August 1, 2011 as a mandatory transfer pursuant to Hawai'i Revised Statutes (HRS) section 602-58(a)(1) (Supp. 2010), as this matter presents a question of imperative public importance. Oral argument was held on February 22, 2012.

This case arises from the 2008 application of DES for a special use permit (County Special Use Permit File No. 2008/SUP-2 (SUP-2)) to expand the existing Waimanalo Gulch Sanitary Landfill (WGSL). The LUC approved SUP-2 subject to, inter alia, a condition prohibiting WGSL from accepting municipal solid waste (or any other waste besides ash and residue from H-POWER) after July 31, 2012. The validity of this condition (Condition 14) is the sole issue raised by DES on appeal.

While we acknowledge the authority of the LUC to impose restrictive conditions on its approval of special use permits, we hold that Condition 14 is inconsistent with the evidence shown in

---

[1] The Honorable Rhonda A. Nishimura presided.

the record and not supported by substantial evidence. Accordingly, because the LUC's approval of SUP-2 was expressly given "subject to" the LUC's imposition of Condition 14, a condition which appears to be material to the LUC's approval, we vacate the circuit court's judgment affirming the LUC's approval of SUP-2, and remand this matter to the circuit court with instructions that the circuit court remand this matter to the LUC for further proceedings consistent with this opinion.

## I.   BACKGROUND

### A.   DES' Application To Expand WGSL

WGSL is located at Waimanalo Gulch, O'ahu, Hawai'i, Tax Map Key Nos. (1) 9-2-03: 72 and 73, and consists of a total of approximately 200 acres.  The WGSL property is owned by the City and County of Honolulu and is classified within the state agricultural district.  Since 1989, a portion of the WGSL property has been used as a landfill.  WGSL is the only public landfill on Oahu permitted to receive municipal solid waste (MSW),[2] and the only permitted repository for the ash and residue produced by the City's H-POWER waste-to-energy facility.[3]  The need for additional landfill space to accommodate the volume of,

---

[2]     Municipal solid waste (MSW) refers to "garbage."

[3]     In addition to being permitted to accept MSW and ash and residue from H-POWER, WGSL is also permitted to accept non-hazardous industrial waste, which is defined as "special waste."

3

inter alia, MSW, ash, and residue deposited at WGSL was the basis of DES' 2008 application for SUP-2.

The procedure for obtaining a special use permit (SUP) for an area of land within an agricultural district greater than 15 acres is set forth in Chapter 205 of the HRS. Pursuant to HRS section 205-6[4], an application for an SUP in the City and County

---

[4]    HRS section 205-6 states, in pertinent part:

(a) Subject to this section, the county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified. Any person who desires to use the person's land within an agricultural or rural district other than for an agricultural or rural use, as the case may be, may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired. . . .

. . .

(d)  Special permits for land the area of which is greater than fifteen acres or for lands designated as important agricultural lands shall be subject to approval by the land use commission. <u>The land use commission may impose additional restrictions as may be necessary or appropriate in granting the approval</u>, including the adherence to representations made by the applicant.

(e) A copy of the decision, together with the complete record of the proceeding before the county planning commission on all special permit requests involving a land area greater than fifteen acres or for lands designated as important agricultural lands, shall be transmitted to the land use commission within sixty days after the decision is rendered.

Within forty-five days after receipt of the complete record from the county planning commission, the land use commission shall act to approve, approve with modification, or deny the petition. A denial either by the county planning commission or by the land use commission, or a modification by the land use commission, as the case may be, of the desired use shall be appealable to the circuit court of the circuit in which the land is situated and shall be made pursuant to the

continue...

4

of Honolulu must first be approved by the Planning Commission of the City and County of Honolulu ("Planning Commission"). HRS § 205-6(a)-(d) (Supp. 2008). Thereafter, LUC approval is required, and the LUC may approve, approve with modification, or deny the Planning Commission's decision. See HRS § 205-6(d), (e) (Supp. 2008). In accordance with HRS section 205-6, DES applied for SUP-2, seeking to expand the existing 107.5 acres of WGSL by approximately 92.5 acres. The proposed SUP would thus allow DES to utilize the entire 200-acre parcel of land as a landfill.

1. **DES' Application with the City Department of Planning and Permitting**

The portion of the WGSL property that operated as the City's landfill from 1989 to 2009 was subject to SUP File No. 86/SUP-5 (SUP-5). On December 3, 2008, DES filed an application for SUP-2 (to supercede then-existing SUP-5), which sought the 92.5-acre expansion of WGSL. The proposed expansion included approximately thirty-seven acres of new landfill cells, with the remaining area dedicated to landfill-associated support infrastructure. The City Department of Planning and Permitting

---

...continue

Hawaii rules of civil procedure.

HRS § 205-6(a), (d)-(e) (Supp. 2008) (emphasis added).

processed the application and recommended its approval to the Planning Commission, subject to a number of conditions.

## 2.    Proceedings before the Planning Commission

On April 16, 2009, Colleen Hanabusa, Maile Shimabukuro, and Ko Olina Community Association (Intervenors-Appellees) filed a petition to intervene before the Planning Commission.  The Planning Commission granted intervention on May 20, 2009.

The Planning Commission conducted a contested case hearing on June 22, 2009, June 24, 2009, July 1, 2009, July 2, 2009, and July 8, 2009.  On July 31, 2009, the Planning Commission recommended approval of SUP-2 subject to ten conditions.  The Planning Commission further recommended approval of the withdrawal of SUP-5 and the conditions therein, upon SUP-2 taking effect.

On August 4, 2009, the Planning Commission issued its Findings of Fact, Conclusions of Law, and Decision and Order (Planning Commission's Decision and Order) (Exhibit "A").  The findings of fact that are relevant to this appeal include the following:

> 33.  [Chief of the City Department of Environmental Services, Refuse Division] Mr. Doyle testified that [DES] will begin in 2010 efforts to identify and develop a new landfill site to supplement WGSL.
>
> 34.  Mr. Doyle also testified that it would take more than seven years to identify and develop a new landfill site.

6

. . .

89.    According to Joseph Whelan, as of March 16, 2009, there was approximately 12 month [sic] of landfill airspace capacity remaining in the municipal solid waste ("MSW") portion of the current SUP area, and approximately 24 months of landfill airspace capacity remaining in the ash portion of the current SUP area.  See Tr. 6/24/09, 81:22-82:6, 83:1-14.

90.    On December 1, 2004, the City Council adopted Resolution No. 04-349, CD1, FD1, which selected the Property as the site for the City's landfill.  See Exhibit "A20."

91.    The proposed expansion of the landfill within the Property is needed because WGSL is a critical part of the City's overall integrated solid waste management efforts.

92.    Continued availability of WGSL is required as a permit condition to operate H-POWER and to engage in interim shipping of waste, for cleanup in the event of a natural disaster, and because there is material that cannot be combusted, recycled, reused, or shipped.

93.    Therefore, a landfill is currently necessary for proper solid waste management, the lack of which would potentially create serious health and safety issues for the residents of Oahu.

94.    WGSL is the only permitted public [municipal solid waste] facility on the island of Oahu and the only permitted repository for the ash produced by H-POWER.

95.    WGSL is a critical portion of the City's overall Integrated Solid Waste Management Plan ("ISWMP"), which looks at all of the factors that make up solid waste management, including reuse and recycling, the H-POWER facility, and landfilling for material that cannot be recycled or burned for energy.  The ISWMP is required by State law and approved by [the Department of Health] after public comments.  One theme of the ISWMP is to minimize landfill disposal.

96.    Currently, approximately 1.8 million tons of waste is produced on Oahu per year.  This does not include material deposited at the PVT Landfill.  Approximately, 340,000 tons of MSW in 2006, and approximately 280,000 tons of MSW in 2008, were landfilled at WGSL.  These amounts fluctuate based on such things as recycling and the economy.  Approximately 170,000 to 180,000 tons of ash from the H-POWER facility is deposited at WGSL each year.

97.    Other items that cannot be recycled or burned at H-POWER are deposited at WGSL, such as screenings and sludge from sewage treatment plants, animal carcasses, tank bottom

sludge, contaminated food waste that cannot be recycled, and contaminated soil that is below certain toxicity levels.

. . .

101.  By 2012, when H-POWER's third boiler is expected to be operational, the City, through its various solid waste management programs, expects to divert eighty (80) percent of the waste stream, with the remaining twenty (20) percent being landfilled at WGSL.

. . .

107.  The project is consistent with the City's general plan.  WGSL is an important public facility that will provide a necessary facility to meet future population needs and accommodate growth in the region; WGSL's eventual closure will allow the Property to be reclaimed for other public uses; and WGSL is needed in the event of a natural disaster.  See Tr. 5/22/09, 71:8-25; 72:1-25; Exhibit "A1" at pp. 8-25 through 8-28.

(Emphases added.)  The Planning Commission's relevant conclusions

of law include:

4.    Based on the findings set forth above . . . [DES'] request for a new State Special Use Permit (a) is not contrary to the objectives sought to be accomplished by the state land use law and regulations; (b) would not adversely affect surrounding property as long as operated in accordance with governmental approvals and requirements, and mitigation measures are implemented in accordance with [DES'] representations as documented in the 2008 FEIS; and (c) would not unreasonably burden public agencies to provide roads and streets, sewers, water, drainage and school improvements, or police and fire protection.  The Planning Commission further concludes that the same unusual conditions, trends, and needs that existed at the time the original Special Use Permit was granted continue to exist and that the land on which WGSL is located continues to be unsuited for agricultural purposes.

5.    The Planning Commission concludes that the Applicant has met its burden of proof with respect to the provisions set forth in Section 2-45 of the RPC.

The Planning Commission's Decision and Order approved

SUP-2 for the proposed expansion of WGSL, and permitted DES' use

8

of the landfill "until capacity as allowed by the State Department of Health is reached[:]"

> Pursuant to the foregoing Findings of Fact and Conclusions of Law, it is the Decision and Order of the Planning Commission to DENY Intervenors' Motion to Dismiss Application. It is the further Decision and Order of the Planning Commission to APPROVE Applicant's Special Use Permit Application File No. 2008/SUP-2 ("2008/SUP-2"), for a new SUP for the existing and proposed expansion of WGSL, located at Tax Map Key Nos. 9-2-3: Parcels 72 and 73, totaling approximately 200.622 acres, until capacity as allowed by the State Department of Health is reached, subject to the following conditions . . . .

(Emphasis added.) The conditions required DES, inter alia, to: (1) identify and develop with reasonable diligence -- on or before November 1, 2010 -- one or more new landfill sites to either replace or supplement WGSL and, upon selection, provide written notice to the Planning Commission for determination of whether SUP-2 should be modified or revoked; and (2) continue to use alternative waste disposal technologies in its effort to reduce the City's dependence on WGSL.

Significantly, the Planning Commission's Decision and Order did not designate a date on which SUP-2 would expire, nor a deadline for WGSL's acceptance of MSW. In fact, the author of the Planning Commission's Decision and Order, Commissioner Kerry Komatsubara (Commissioner Komatsubara), explained why a time limit on SUP-2 was not effective or desirable:

> In my opinion, simply putting on a new closure date to [SUP-2] will not lead to the closure of [WGSL]. I believe that the focus should not be on picking a date. The focus should

9

> be on how do we get the City to select a new site because you're not going to close this landfill until you find another site.  I don't think it's in the interest of our community not to have a landfill.
>
> . . .
>
> So what this proposal does is, it says look, [DES] can keep [WGSL] open until [it's] full, until you've reached the capacity, but you have an obligation starting from next year [2010] to start looking for a new site.  Now whether you take it seriously or not, that's up to you because we have the power to call you in, and you have the obligation now to report every year on what you're doing to find a new landfill site whether it be a replacement site or supplemental site or both.  We have the right to hold a hearing at any time we feel that you are not . . . in good faith moving forward with reasonable diligence to find a new site.
>
> . . .
>
> I think going down the old path of just putting a [closure] date in there has not worked.  We put it down three or four times before and every time we came to that date, it was extended further and further...I'd rather not say it's a certain date only to know that when we reach that date we're going to extend it further until we find the new site.  I'd rather focus on an effort to find a new site and have [DES] come in every year and explain to us where you are in your effort to find a new site.  That's what this proposal does.

Commissioner Komatsubara reiterated that "[t]he term or the length of [SUP-2] <u>shall be until the Waimanalo Gulch landfill reaches its capacity</u> as compared to a definite time period of "X" number of years."  (Emphasis added.)

### 3.    LUC proceedings

In accordance with HRS section 205-6(e), the complete record of proceedings before the Planning Commission was transmitted to the LUC on August 20, 2009.  After reviewing DES' application and the Planning Commission Record, and receiving

10

additional oral and written testimony on September 24, 2009,

Commissioner Reuben Wong (Commissioner Wong) made the following

motion:

> I'd like to move that the special use permit application before us be granted with . . . a number of conditions such as that all of the conditions that were set forth in [SUP-5] be incorporated.
>
> That is to say, for example, conditions dealing with blasting, hours of operations, building a berm -- and I believe there are 19 of them, that we ultimately ended up with 19; subject also to the condition that solid waste be allowed at [WGSL] but only up to July 31, 2012.
>
> Let me comment momentarily. I think the record indicates that the third [H-POWER] burner would be built by around the end of 2011 but fully operational by July 31, 2012.
>
> Another condition would be that after July 31, 2012 only ash and residue from the [H-POWER facility] be allowed to be placed on [WGSL]. To make that clear, what we're saying is that no more municipal waste, no rubbish, trash, that sort of thing, save and except the ash and residue that may come from the [H-POWER] plant.
>
> Another condition is that the City Administration is a party in this case and the city council through the City Administration be required to report to the public every three months what the city council is doing with respect to the continued use of [WGSL].
>
> Those reports shall also include what funding arrangements are being considered by the city council and the City Administration to fulfill whatever position they plan to report on.
>
> . . .
>
> Another condition is that in reporting to the public that the city council and the Administration every three months would have a public hearing to report to the public the status of the attempt to either reduce or continue use of [WGSL] so that it's not only publication through the media but there will be public hearings so that people can attend and the officials can face the public and tell them face-to-face, 'This is what we are going to do.'
>
> So that, Mr. Chairman, is my motion. I know it's lengthy but hopefully with the second I can have further discussion.

(Emphases added.)  The LUC commissioners adopted the above motion by a five to three vote.

On October 22, 2009, the LUC issued its written Order adopting the Planning Commission's "Findings of Fact, Conclusions of Law, and Decision and Order" as its own findings, conclusions, decision and order (LUC Order) (Exhibit "B").  Significantly, the LUC Order approved DES' Application subject to certain express conditions, including Condition 14:[5]

> The LUC, upon consideration of the Planning Commission's Findings of Fact, Conclusions of Law, And Decision And Order, the oral arguments of the parties and the record and files herein, and good cause existing and upon motion duly passed by the LUC,
>
>> HEREBY ORDERS that the LUC shall adopt the Planning Commission's Findings of Fact, Conclusions of Law, And Decision And Order **subject to** the following conditions . . . .
>
> . . .
>
> 14.  Municipal solid waste shall be allowed at the WGSL up to July 31, 2012, provided that only ash and residue from H-POWER shall be allowed at the WGSL after July 31, 2012.

(Emphases added.)

On October 29, 2009, DES filed a motion for reconsideration requesting, inter alia, a modification of Condition 14.  DES filed its notice of appeal with the circuit

_____

[5]      The LUC's approval of DES' Application was also made subject to: (1) the withdrawal of SUP-5, provided that the existing conditions shall be incorporated in SUP-2 to the extent that they are consistent with the LUC Order and not duplicative of any of its conditions; and (2) the conditions as recommended by the Planning Commission.

12

court on November 19, 2009, and the LUC denied the motion for reconsideration on December 1, 2009.

B.    Circuit Court Proceedings

DES timely appealed the LUC Order pursuant to HRS section 205-6(e), and HRS section 91-14.[6]  On March 1, 2010, DES filed its opening brief with the circuit court and argued that Condition 14 was "Arbitrary and Capricious, Characterized by Abuse of Discretion, and a Clearly Unwarranted Exercise of Discretion"[7] because the record before the Planning Commission, on which the LUC relied, established that there will always be waste material that cannot be combusted, recycled, reused or shipped.  Therefore, DES argued, an option to dispose of MSW at WGSL will continue to be necessary beyond the July 31, 2012 deadline as imposed in Condition 14.

_____

[6]    HRS section 91-14 states, in pertinent part:

(a) Any person aggrieved by a final decision and order in a contested case . . . is entitled to judicial review thereof under this chapter[.]

(b) [P]roceedings for review shall be instituted in the circuit court . . . within thirty days after service of a certified copy of the final decision and order of the agency[.]

HRS § 91-14(a)-(b) (1993).

[7]    HRS section 91-14(g)(6) authorizes the circuit court to modify an agency decision if it is "arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion."  HRS § 91-14(g)(6) (1993).

13

Intervenors-Appellees filed their answering brief on April 8, 2010, and argued that the imposition of Condition 14 was within the LUC's discretion. Thereafter, the LUC filed its answering brief on April 12, 2010, and argued that (1) DES did not have standing to appeal because it was not an "aggrieved" party, and (2) DES was not precluded from requesting an extension of the July 31, 2012 closure deadline at a later time. Moreover, the LUC argued, Condition 14 was reasonable and supported by the record.

DES filed its reply on April 22, 2010, and argued that pursuant to HRS section 205-6(e), it had standing to appeal the LUC's decision: "[A] modification by the land use commission as the case may be, of the desired use shall be appealable to the circuit court of the circuit in which the land is situated . . . ."[8] See HRS § 205-6(e) (Supp. 2008) (emphases added). In addition, DES argued that both the LUC and Intervenors-Appellees failed to rebut the assertion that Condition 14 is arbitrary and a clearly unwarranted exercise of discretion.

---

[8]    See also Hawai'i Administrative Rules (HAR) section 15-15-96(c), which reads: "A denial or modification of the special permit, as the case may be, of the desired use shall be appealable to the circuit court of the circuit in which the land is situated and shall be made pursuant to the Hawaii rules of civil procedure."  HAR § 15-15-96(C).

14

DES' appeal was heard on July 14, 2010, and by an order dated September 21, 2010, the circuit court: (1) determined that DES was "aggrieved" within the meaning of HRS section 91-14(a); and (2) affirmed Condition 14. Final judgment was entered on October 19, 2010, and the Notice of Entry of Judgment was filed on October 21, 2010.

C.  The Instant Appeal

DES filed its notice of appeal with the ICA on November 12, 2010. Intervenors-Appellees did not appeal the circuit court's ruling. This appeal was fully briefed before the ICA when DES filed its timely application for transfer with this court on July 14, 2011. We granted this application for transfer on August 1, 2011.

In its Opening Brief, DES argues that the circuit court erred in affirming the LUC's July 31, 2012 deadline for the acceptance of MSW at WGSL. As stated earlier herein, the validity of Condition 14 is the sole issue raised on appeal.[9] DES reiterates its position that the imposition of Condition 14 is arbitrary in light of the record and findings adopted by the

---

[9]     DES also contends that Condition 14 could not be interpreted as a mere "permissive advisory condition" as it believed the LUC to have argued. It appears, however, that DES misinterpreted the LUC's argument because in its answering brief, the LUC clarified that it was referring to Conditions 15 and 16 as permissive advisory conditions, not Condition 14. Conditions 15 and 16 are not at issue in the present appeal.

15

LUC, which clearly demonstrated the continuing need to dispose of, <u>inter</u> <u>alia</u>, MSW at WGSL beyond July 31, 2011.  Moreover, DES argues, no other landfill site will be available by July 31, 2012 as both the record before the Planning Commission and the findings adopted by the LUC established that it will take more than seven years to identify and develop a new landfill site to either replace or supplement WGSL.  DES requests that this court strike "the July 31, 2012[] deadline to accept MSW at WGSL, contained in Condition 14 of the [LUC Order], and permit the disposal of MSW at WGSL until that site reaches capacity as set forth by the [Planning Commission's Order]."

In its Answering Brief the LUC argues that (1) DES lacks standing to appeal as an injured and "aggrieved party" because Condition 14 will not take effect until July 31, 2012,[10] (2) DES is not precluded from requesting relief from Condition 14 in the future, and (3) DES has not been burdened with a threat of sanction for failure to comply with Condition 14.  The LUC additionally argues that Condition 14 is supported by substantial evidence in the record as a whole.

_____

[10] As stated earlier herein, the circuit court determined that DES had standing to appeal the LUC Order as an "aggrieved" party within the meaning of HRS section 91-14(a).  Neither the LUC nor the Intervenors-Appellees appealed the circuit court's judgment.

16

In their answering brief, Intervenors-Appellees primarily argue that HRS section 205-6(d) authorizes the LUC to impose conditions on SUPs, and that the LUC's imposition of Condition 14 was not an abuse of discretion. support of their argument that the closure date of WGSL for MSW is reasonable, and that DES was previously given notice that a closure date would eventually be imposed, Intervenors-Appellees emphasize prior commitments made by previous City administration officials in 2003 that WGSL would close by 2008. They further argue that DES should be judicially estopped from taking contrary positions under oath regarding the closure of WGSL.

In its reply brief to the LUC's answering brief, DES maintains that it is entitled to appeal Condition 14 of the LUC Order because the July 31, 2012 deadline prohibiting WGSL from accepting MSW caused it to suffer threatened, if not actual, injury. In response to Intervenors-Appellees' answering brief, DES argues that judicial estoppel does not apply to this case because the City's 2003 position that WGSL would close by May 1, 2008 was overridden by the Honolulu City Council's December 1, 2004 designation of WGSL as Oahu's municipal landfill after May 1, 2008. DES argues that both the LUC and Intervenors-Appellees failed to rebut the assertion that Condition 14 is arbitrary and

capricious.  In each reply brief, DES emphasizes that Condition 14 is unsupported in the record.

### III.  STANDARDS OF REVIEW

A.  Secondary Appeal

> Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal.  The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) . . . to the agency's decision.

Save Diamond Head Waters LLC v. Hans Hedemann Surf, Inc., 121 Hawaiʻi 16, 24, 211 P.3d 74, 82 (2009) (citations omitted).

B.  Substantial Evidence

This court has defined substantial evidence as "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."  In Re Water Use Permit Applications, 94 Hawaiʻi 97, 119, 9 P.3d 409, 431 (2000).

C.  Judicial Review of Contested Cases

HRS section 91-14(g) (1993) provides that "[u]pon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings . . . ."  Id. (emphases added).

IV.  DISCUSSION

A.  Although The LUC Has Authority To Impose Restrictive
    Conditions In Its Approval of SUPs, The Conditions Must Be
    Supported By Substantial Evidence.

HRS section 205-6 governs the LUC's authority to impose

restrictive conditions in its approval of SUPs and provides that:

> Special permits for land the area of which is greater than
> fifteen acres or for lands designated as important
> agricultural lands shall be subject to approval by the land
> use commission. The land use commission may impose
> additional restrictions as may be necessary or appropriate
> in granting the approval, including the adherence to
> representations made by the applicant.

HRS § 205-6(d) (Supp. 2008) (emphasis added).  The statute

unambiguously authorizes the LUC to impose additional

restrictions in its approval of SUPs.[11]  Id. (emphasis added);

see also State v. Kahawai, 103 Hawai'i 462, 465, 83 P.3d 725, 728

(2004) ("The term 'may' is generally construed to render

_____

[11]     The legislative history of HRS section 205-6 provides further
support that the Hawai'i Legislature intended the LUC to have such authority:
the 1970 Legislature declared that the purpose of HRS section 205-6, which
governs special permits, was, inter alia, "to authorize the land use
commission to impose additional restrictions on special permits which allow
unusual and reasonable uses on land within the agricultural and rural
districts."  H. Conf. Comm. Rep. No. 15, in 1970 House Journal, at 1231
(emphasis added); see also S. Stand. Comm. Rep. No. 90-70, in 1970 Senate
Journal, at 1052 ("The purpose of this bill is to give the Land Use Commission
explicit statutory authority to impose restrictions as may be necessary or
appropriate on special permits applied for pursuant to Section 205-6, Hawaii
Revised Statutes.) (emphasis added); see also S. Stand. Comm. Rep. No. 242-70,
in 1970 Senate Journal, at 1123 ("The purpose of this bill is to provide the
Land Use Commission the authority to impose protective restrictions on special
permits which allow unusual and reasonable uses of land within the
Agricultural and Rural Districts.) (emphasis added); see also H. Stand. Comm.
Rep. No. 708-70, in 1970 House Journal, at 1142 ("The purpose of this bill is
to authorize the Land Use Commission to impose additional restrictions, as may
be necessary or appropriate, in granting approval on special permits[.]")
(emphasis added).

optional, permissive, or discretionary the provision in which it is embodied; that is so at least when there is nothing in the wording, sense, or policy of the provision demanding an unusual interpretation.") (Quoting State ex rel. City of Niles v. Bernard, 53 Ohio St.2d 31, 372 N.E.2d 339, 341 (1978)).

While the LUC is authorized to impose restrictive conditions in its approval of SUPs, its decision to impose such a restriction must be supported by substantial evidence in the record. See Kinkaid v. Bd. of Review of City & County of Honolulu, 106 Hawai'i 318, 325, 104 P.3d 905, 912 (2004) (recognizing that courts are authorized to set aside administrative action that is without evidentiary support). If the LUC's decision to impose Condition 14 was unsupported by substantial evidence in the record in this case, we may "remand the case with instructions for further proceedings[.]" Save Diamond Head Waters, 121 Hawai'i at 24, 211 P.3d at 82; see also HRS § 91-14(g) (1993).

Although we have not infrequently discussed HRS section 91-14(g) in the context of determining the standard of review applicable to a decision or order of an administrative agency, the specific issue raised in this case is one of first impression: whether a restrictive condition (Condition 14)

imposed by decision or order of the agency (LUC) is supported by substantial evidence.

In the absence of such authority, this court may turn to the Administrative Procedure Act, 5 U.S.C. section 706, (the federal analog to HRS Chapter 91) for guidance. See e.g., Doe Parents No. 1 v. State Dep't of Educ., 100 Hawai'i 34, 59-60, 58 P.3d 545, 570-71 (2002). 5 U.S.C. section 706 states, in relevant part:

> The reviewing court shall--
>
> . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
> (E) unsupported by substantial evidence[.]

5 U.S.C. § 706(2)(E) (emphases added). While not definitive, federal caselaw discussing 5 U.S.C. section 706(2)(E) is helpful.

In Bustamante v. Massanari, 262 F.3d 949 (9th Cir. 2001), the Ninth Circuit Court of Appeals reversed and remanded an agency's decision that was not supported by substantial evidence. Bustamante involved the denial of a claimant's application for disability benefits and supplemental security income. Id. at 951. There, the claimant was entitled to receive benefits as long as his impairment was categorized as "severe," meaning that it "limited his ability to do basic work." Id. at 955. The evidence in the record revealed that the claimant

suffered from a personality disorder and a substance abuse addiction disorder, which resulted in moderate difficulties with activities of daily living, marked difficulties in maintaining social function, and deficiencies in concentration. Id. at 951. Nevertheless, the Administrative Law Judge (ALJ) determined that the claimant's mental impairments were not "severe," and thus, did not form the basis for disability eligibility. Id. at 952. The United States District Court for the Northern District of California affirmed the Social Security Administration's affirmation of the ALJ's decision, and in a one-line order stated that, "[the ALJ's] decision is supported by substantial evidence." Id.

The Ninth Circuit set aside the denial of disability benefits because the ALJ's decision was not supported by the evidence in the record as a whole. Id. at 956. The Court defined substantial evidence as "more than a mere scintilla but less than a preponderance." Id. at 953; see also Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) ("When the evidence can rationally be interpreted in more than one way, the court must uphold the [agency's] decision.") (citations omitted). The Ninth Circuit concluded that the evidence in the record overwhelmingly supported that the claimant suffered from a severe mental impairment: (1) every psychiatrist or psychologist (four

22

total) who examined the claimant found significant mental problems; and (2) the claimant suffered from personality and substance abuse addiction disorders that resulted in "moderate difficulties with activities of daily living, marked difficulties in maintaining social function, and . . . deficiencies in concentration, persistence or pace." Bustamante, 262 F.3d at 956. In light of such evidence, the ALJ's conclusion that the claimant was capable of performing basic work activities and thus, did not suffer from a severe mental illness, was not supported by substantial evidence. Id.

Sousa v. Callahan, 143 F.3d 1240 (9th Cir. 1998), which involved the denial of a claim for disability insurance, is similarly instructive. There, the United States District Court for the Eastern District of California affirmed the Appeals Council's determination that the claimant was not disabled during the relevant time period. Id. at 1242.

The Ninth Circuit Court of Appeals reversed and remanded the case because substantial evidence did not support the Appeals Council's decision that the claimant was not disabled. Id. at 1243. Specifically, the Ninth Circuit concluded that the Appeals Council's determination was based on the "improper rejection of lay testimony[,]" which otherwise revealed that the claimant was "unable to cope with everyday

23

living[,]" and that she struggled to take care of personal needs. Id. at 1243. Based largely upon such testimony, Dr. Richard Lundeen (Dr. Lundeen) ultimately concluded that "there [was] sufficient medical and lay evidence to establish with reasonable medical certainty that [the claimant] was, [at the relevant time period], suffering from [an] identifiable mental health disorder . . . [resulting in] a marked impairment of [the claimant's] psychological, social, and occupational functioning." Id. at 1244. Nevertheless, the Appeals Council rejected Dr. Lundeen's opinion because his assessment was dependent on the lay testimony it had rejected. Id.

The Ninth Circuit noted that but for the improper rejection of such lay testimony, the validity of Dr. Lundeen's opinion would not have been questioned. Without considering such relevant testimony, the Court held that the Appeals Council's determination was not supported by substantial evidence. Id. at 1244-45.

B. Our Analysis Of This Case

Having reviewed the applicable law on the LUC's authority to impose restrictive conditions in its approval of SUPs, we now turn to review the facts of this case in order to resolve the sole issue before us: whether the imposition of

24

Condition 14 by the LUC was supported by substantial evidence in the record as a whole. <u>Bustamante</u>, 262 F.3d at 953.

### 1. Planning Commission's Findings of Fact, Conclusions of Law, and Decision and Order

The proceedings before the Planning Commission are discussed earlier in the Background section of this opinion. Following a contested case hearing over a period of days, the Planning Commission issued its Findings of Fact, Conclusions of Law, and Decision and Order on August 4, 2009. The findings of fact that are relevant to this appeal include the following:

> 33. [Chief of the City Department of Environmental Services, Refuse Division] <u>Mr. Doyle testified that [DES] will begin in 2010 efforts to identify and develop a new landfill site to supplement WGSL.</u>
>
> 34. Mr. Doyle also testified that it would take <u>more than seven years</u> to identify and develop a new landfill site.[12]
>
> . . .
>
> 89. According to Joseph Whelan, as of March 16, 2009, there was approximately 12 month [sic] of landfill airspace capacity remaining in the municipal solid waste ("MSW") portion of the current SUP area, and approximately 24 months of landfill airspace capacity remaining in the ash portion of the current SUP area. <u>See</u> Tr. 6/24/09, 81:22-82:6, 83:1-14.
>
> 90. On December 1, 2004, the City Council adopted Resolution No. 04-349, CD1, FD1, which selected the Property as the site for the City's landfill. <u>See</u> Exhibit "A20."

---

[12] We note that this is not an actual finding of fact, but a recitation of the testimony of a witness. "Recitation of testimony is not [a] finding of [fact]." <u>In re Doe</u>, 96 Hawai'i 255, 259, 30 P.3d 269, 273 (App. 2001). In context of the findings of fact and conclusions of law, however, it is clear that this was intended to be a finding. We encourage courts and factfinding tribunals to properly state their findings, however, and not merely recite testimony.

91.   The proposed expansion of the landfill within the Property is needed because WGSL is a critical part of the City's overall integrated solid waste management efforts.

92.   Continued availability of WGSL is required as a permit condition to operate H-POWER and to engage in interim shipping of waste, for cleanup in the event of a natural disaster, and because there is material that cannot be combusted, recycled, reused, or shipped.

93.   Therefore, a landfill is currently necessary for proper solid waste management, the lack of which would potentially create serious health and safety issues for the residents of Oahu.

94.   WGSL is the only permitted public [municipal solid waste] facility on the island of Oahu and the only permitted repository for the ash produced by H-POWER.

95.   WGSL is a critical portion of the City's overall Integrated Solid Waste Management Plan ("ISWMP"), which looks at all of the factors that make up solid waste management, including reuse and recycling, the H-POWER facility, and landfilling for material that cannot be recycled or burned for energy. The ISWMP is required by State law and approved by [the Department of Health] after public comments. One theme of the ISWMP is to minimize landfill disposal.

96.   Currently, approximately 1.8 million tons of waste is produced on Oahu per year. This does not include material deposited at the PVT Landfill. Approximately, 340,000 tons of MSW in 2006, and approximately 280,000 tons of MSW in 2008, were landfilled at WGSL. These amounts fluctuate based on such things as recycling and the economy. Approximately 170,000 to 180,000 tons of ash from the H-POWER facility is deposited at WGSL each year.

97.   Other items that cannot be recycled or burned at H-POWER are deposited at WGSL, such as screenings and sludge from sewage treatment plants, animal carcasses, tank bottom sludge, contaminated food waste that cannot be recycled, and contaminated soil that is below certain toxicity levels.

.   .   .

101.  By 2012, when H-POWER's third boiler is expected to be operational, the City, through its various solid waste management programs, expects to divert eighty (80) percent of the waste stream, with the remaining twenty (20) percent being landfilled at WGSL.

.   .   .

26

> 107. The project is consistent with the City's general plan. WGSL is an important public facility that will provide a necessary facility to meet future population needs and accommodate growth in the region; WGSL's eventual closure will allow the Property to be reclaimed for other public uses; and WGSL is needed in the event of a natural disaster. See Tr. 5/22/09, 71:8-25; 72:1-25; Exhibit "A1" at pp. 8-25 through 8-28.

(Emphases added.) The Planning Commission's conclusions of law included the following:

> 4. Based on the findings set forth above . . . [DES'] request for a new State Special Use Permit (a) is not contrary to the objectives sought to be accomplished by the state land use law and regulations; (b) would not adversely affect surrounding property as long as operated in accordance with governmental approvals and requirements, and mitigation measures are implemented in accordance with [DES'] representations as documented in the 2008 FEIS; and (c) would not unreasonably burden public agencies to provide roads and streets, sewers, water, drainage and school improvements, or police and fire protection.
>
> 5. The Planning Commission concludes that the Applicant has met its burden of proof with respect to the provisions set forth in Section 2-45 of the RPC.

The Planning Commission's Decision and Order approved SUP-2 for the proposed expansion of WGSL, and permitted DES' use of the landfill "until capacity as allowed by the State Department of Health is reached." Significantly, the Planning Commission's Decision and Order did not designate a date on which SUP-2 would expire, nor a deadline for WGSL's acceptance of MSW. To the contrary, the Planning Commission's Decision and Order specifically found, inter alia, that it would take more than seven years to identify and develop a new landfill site. Indeed, it would be difficult to reconcile the foregoing findings and

27

conclusions with a closure date of WGSL to accept MSW prior to the identification and development of a landfill to either replace or supplement WGSL.[13]

---

[13] The testimony of Frank Doyle, DES' then Chief of Refuse, was illustrative of the time-frame it will take for identifying and developing a new landfill site:

> Q.   I guess my question is, how long does it take for the whole process, identification of a new site, blue ribbon commission hearing, [Environmental Impact Statements], site selection, hiring the contractors, going through the procurement process, going through the protest process, building, construction and opening the doors, how long does it take?
>
> . . .
>
> And the reason why I ask it that way, I want to make sure no one has the impression that, in two years, we're going to have a new landfill --
>
> [Mr. Doyle].    No, no, absolutely not. We are looking at seven-plus [years].
>
> Q.   How long did it take the last time, for the first time on [WGSL]?
>
> . . .
>
> I think it was in 1982 that the city determined the need for a new leeward area sanitary landfill. So, from 1982 -- and I thought you testified earlier that the Waimanalo Gulch opened its doors in 1989.
>
> [Mr. Doyle].    Correct.
>
> Q.   So if it took seven years back in the 1980's, how long is it going to take today?
>
> [Mr. Doyle].    Well, I said seven [years] twice.
>
> Q.   Okay, so your best guess is, what? Ten? Or will you stick to seven-plus?
>
> [Mr. Doyle].    I will have to stick to seven-plus [years], because we always try to do it as quickly as we can.

continue...

2.    **Land Use Commission Order Adopting the City and County of Honolulu Planning Commission's Findings of Fact, Conclusions of Law, and Decision and Order With Modifications**

The proceedings before the LUC are discussed earlier in the Background section of this opinion.  Following receipt of the Planning Commission's Findings of Fact, Conclusions of Law, and Decision and Order, and the record of the proceedings before the Planning Commission, the LUC held a meeting in which it received additional oral and written testimony.  Testimony was presented both in favor of and in opposition to the Application of DES; as in the Planning Commission, the testimony in opposition focused on the broken promises of past City administrations to identify and develop an alternative landfill site, the cultural significance of the WGSL site, and the deleterious effect of operating a landfill on the site.

At the meeting, Commissioner Wong made a motion to accept DES' Application, subject to the conditions imposed by the Planning Commission, but adding an additional restrictive condition: after July 31, 2012, only ash and residue from the H-POWER facility would be allowed to be deposited in WGSL.

---

...continue

(Emphases added.)  Notably, the minimum time frame of "seven-plus" years for identifying and developing a new landfill site was incorporated into the Planning Commission's findings, which the LUC adopted, as will be discussed later herein.

29

Commissioner Wong reiterated, "[t]o make that clear, what we're saying is that no more municipal rubbish, trash, that sort of thing, save and except the ash and residue that may come from the [H-POWER] plant."  The Commissioners approved Wong's motion by a five to three vote.

On October 22, 2009, the LUC issued an Order Adopting the City and County of Honolulu Planning Commission's Findings of Fact, Conclusions of Law, and Decision and Order With Modifications.  Significantly, and as discussed earlier herein, the LUC's approval of SUP-2 was expressly given "subject to" the LUC's imposition of several conditions:

> The LUC, upon consideration of the Planning Commission's Findings of Fact, Conclusions of Law, And Decision And Order, the oral arguments of the parties and the record and files herein, and good cause existing and upon motion duly passed by the LUC,
>
> > HEREBY ORDERS that the LUC shall adopt the Planning Commission's Findings of Fact, Conclusions of Law, And Decision And Order, subject to the following conditions . . . .

(Emphasis added.)

The validity of Condition 14 is the sole issue in this case.  Condition 14 imposed the following restriction:

> 14.  Municipal solid waste shall be allowed at the WGSL up to July 31, 2012, provided that only ash and residue from H-POWER shall be allowed at the WGSL after July 31, 2012.

(Emphases added.)

30

3.   **The LUC's action in imposing Condition 14 is inconsistent with the evidence shown in the record and not supported by substantial evidence**

LUC Condition 14 is not supported by substantial evidence in the record, including the Planning Commission's Findings of Fact, Conclusions of Law, and Decision and Order, which were adopted by the LUC in its Order Adopting the City and County of Honolulu Planning Commission's Findings of Fact, Conclusions of Law, and Decision and Order With Modifications filed October 22, 2009.

Stated simply, the above-quoted Findings of Fact, Conclusions of Law, and Decision and Order by the Planning Commission, all expressly adopted by the LUC, do not support the restriction in Condition 14 imposing a termination date of July 31, 2012 for the deposit of MSW at WGSL. To the contrary, the Planning Commission's Findings of Fact clearly demonstrate the continuing need to dispose of municipal solid waste at WGSL beyond July 31, 2012. For example, the Planning Commission acknowledged Mr. Doyle's testimony that "it would take more than seven years to identify and develop a new landfill site." The Planning Commission also found that "a landfill is currently necessary for proper solid waste management," and that "WGSL is the only permitted public MSW facility on the island of Oahu[.]" Moreover, the Planning Commission's Decision and Order expressly

31

provides that MSW may be deposited at WGSL's expanded site "until capacity as allowed by the State Department of Health is reached."

Here, as in Bustamante and Sousa, the evidence in the record as a whole does not support, much less constitute "substantial evidence" for the imposition of Condition 14. Thus, Condition 14 cannot stand. See Bustamante, 262 F.3d at 956; see also Sousa 143 F.3d at 1244-45; see also In re Water Use Permit Applications, 94 Hawai'i at 119, 9 P.3d at 431.

C.    Remand To The LUC For Further Proceedings Is Necessary.

The LUC's approval of SUP-2 was given "subject to" the LUC's imposition of several conditions, including Condition 14. Based upon all of the evidence in the record, it would appear that Condition 14 was a material condition to the LUC's approval. Having held that Condition 14 cannot stand because it is inconsistent with the evidence shown in the record and not supported by substantial evidence, the LUC's approval of SUP-2 also cannot stand because Condition 14 was a material condition to the LUC's approval. Consequently, this matter must be remanded to the LUC for further hearings as the LUC deems appropriate.

While we have not found a case directly on point in our jurisdiction,[14] caselaw from other jurisdictions support remand to an agency in circumstances where agency action is not supported by substantial evidence.  In <u>United Jewish Ctr. v. Town of Brookfield</u>, 827 A.2d 11 (Conn. App. Ct. 2003), a property owner's application to build on and around his property was denied by the town's wetlands commission (Commission).  <u>Id.</u> at 13-14.  The property owner sought judicial review of the Commission's denial of his application, and the trial court found that there was no evidence to support the Commission's decision. <u>Id.</u> at 14.  In turn, the trial court remanded the case to the Commission with instructions to issue a permit to allow the property owner to build on and around his property.  <u>Id.</u> at 14-15.

On appeal, the Commission argued, <u>inter</u> <u>alia</u>, that the trial court improperly directed it to issue the requested permit.

---

[14]    While <u>Lanai Co., Inc. v. Land Use Comm'n</u>, 105 Hawaiʻi 296, 97 P.3d 372 (2004), similarly involved: (1)  the judicial review of a decision by the LUC; and (2) pursuant to HRS section 91-14(g), a remand to the circuit court "with instructions to remand the case to the LUC for clarification of its findings, or for further hearings if necessary," <u>id.</u> at 316, 97 P.3d at 392, it is distinguishable from the present matter.  There, the issue was whether substantial evidence supported the LUC's conclusion that an otherwise valid condition was violated.  <u>Id.</u> at 314, 97 P.3d at 390.  Here, the issue is whether substantial evidence in the record supports the LUC's imposition of Condition 14, which is unrelated to the question of whether Condition 14 was violated.

Id. at 20.  When agency action is overturned because of
insufficient findings, the Commission argued, the proper
resolution is a remand for further consideration.  Id.  The
appellate court agreed.

The Connecticut appellate court held that the case
should have been remanded for further proceedings, namely, to
decide whether there was evidentiary support for the issuance of
the requested permit.  Id.  The court emphasized that further
proceedings were necessary upon remand unless the only conclusion
that the Commission could reasonably reach was that permit should
have been issued.  Id.; see also Florida Power & Light Co. v.
Lorion, 470 U.S. 729 (1985) ("If the record before the agency
does not support the agency action . . . the proper course,
except in rare circumstances, is to remand to the agency for
additional investigation or explanation.").  The court reversed
the trial court's judgment "as to the order directing the
commission to issue the permit and . . . remanded [the case] . .
. to the commission for further proceedings consistent with [its]
opinion."  United Jewish Ctr., 827 A.2d at 20.

Liberty v. Police & Firemen's Retirement Bd., 410 A.2d
191 (D.C. 1979), is similarly instructive.  There, the Police and
Firemen's Retirement and Relief Board (the Board) ordered the
retirement of a patrolman from the Police Department by reason of

34

disability not caused or aggravated by police duties. Id. at 192. Although the Board found that family history was but one risk factor causing the patrolman's coronary artery disease, it concluded that it was the most significant factor. Id.

On appeal, the District of Columbia appellate court found that the Board's decision was not supported by substantial evidence because there was no basis in the record for an "unequivocal finding" that the patrolman's performance of police duties did not contribute to his disease. Id. at 193-94. The court stated that "[r]emand is necessary . . . if the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous findings or inferences removed from the picture." Id. at 194 (internal quotation marks omitted).

In the present case, the relevant question is whether the LUC would have reached the same conclusion (approving SUP-2) without its imposition of Condition 14. Based on the record, we cannot so conclude. Thus, we remand to the LUC for further hearings as the LUC may deem appropriate.

## V.   CONCLUSION

Pursuant to HRS section 91-14(g)(5)[15] (1993), we vacate the circuit court's judgment affirming the LUC's approval of SUP-2, and remand this matter to the circuit court with instructions that the circuit court remand this matter to the LUC for further proceedings consistent with this opinion.[16]

| | |
|---|---|
| Dana Viola, Deputy Corporation Counsel, (Gary Y. Takeuchi and Sharon Lam Blanchard, Deputies Corporation Counsel, with her on the briefs), and Robert Brian Black, Deputy Corporation Counsel, for Petitioner/ Appellant-Appellant | /s/ Mark E. Recktenwald<br><br>/s/ Paula A. Nakayama<br><br>/s/ Simeon R. Acoba, Jr.<br><br>/s/ James E. Duffy, Jr.<br><br>/s/ Sabrina S. McKenna |



---

[15]    HRS section 91-14(g)(5) states, in relevant part:

> (g)   Upon review of the record the court may . . . remand the case with instructions for further proceedings . . . if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> . . .
>
> > (5)   Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.]

HRS § 91-14(g)(5) (1993).

[16]    We have been informed in pleadings filed by the LUC that on June 28, 2011, DES filed a "[r]equest for modification of condition 14 of SUP file No. 2008/SUP-2" with the Planning Commission, and that a contested case hearing is ongoing in that proceeding.  On remand, we encourage the LUC to consider any new testimony developed before the Planning Commission in that case.

Sarah R. Hirakami,
  Russell Suzuki, and
  Robyn B. Chun, Deputy
  Attorneys General,
  (Diane Erickson, Deputy
  Attorney General, on the
  brief) for Respondent/
  Appellee-Appellee Land
  Use Commission, State of
  Hawaiʻi

Richard Naiwieha Wurdeman,
  for Respondents/Appellees-
  Appellees Colleen Hanabusa,
  Maile Shimabukuro, and
  Ko Olina Community Association